NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PATRICK McMAHON, | : |
|  | : |
| Plaintiff, | : |
| v. | : |
|  | : |
| RUTGERS, THE STATE UNIVERSITY | : |
| OF NEW JERSEY and SUSAN W. | : |
| SALMOND, | : |
|  | : |
| Defendants. | : |

Civil Action No. 11-02306 (SRC)

OPINION

**CHESLER**, District Judge

This matter is before the court on the motion for summary judgment brought by

Defendants Rutgers, the State University of New Jersey[1] and Susan W. Salmond ("Rutgers" and

"Salmond" and, collectively, "Defendants"), pursuant to Federal Rule of Civil Procedure 56(a).

[Docket Entry 56.]  Plaintiff Patrick McMahon ("McMahon") has opposed.  [Docket Entry 62.]

Pursuant to Federal Rule of Civil Procedure 78, the Court will rule on the papers submitted, and

without oral argument.  For the reasons that follow, Defendants' motion will be granted.

BACKGROUND

Plaintiff Patrick McMahon is a decorated former Air Force captain.  This lawsuit,

originally filed in the Superior Court of New Jersey and removed to this Court, arises out of

McMahon's 2010 dismissal from Rutgers' graduate-level Certified Registered Nurse Anesthesia

---

[1] While Defendants' motion was pending, the University of Medicine and Dentistry of
New Jersey ("UMDNJ") – against whom this lawsuit was originally filed – changed its name to
Rutgers, the State University of New Jersey.  The case caption was changed accordingly, by
order of this Court.  [See Docket Entry 61.]  The names "Rutgers" and "UMDNJ" are used
interchangeably throughout this Opinion.

Program ("CRNA Program").  McMahon was dismissed after receiving four grades worse than "B," (*e.g.*, "C+," "C," etc.), which under grading policies in effect at the time, mandated his dismissal from the CRNA Program.  McMahon alleges that Defendants' decision to dismiss him from the CRNA Program breaches an implied contract between himself and Rutgers and violates his rights under the federal and New Jersey constitutions.  McMahon further alleges Defendants discriminated against him because of his military status, in violation of New Jersey's Law Against Discrimination ("LAD"), N.J. Stat. Ann. § 10:5-1 to -49.  The relevant facts are as follows:

### A.       Matriculation Into the CRNA Program

McMahon began his studies at UMDNJ's School of Nursing (the "School of Nursing") in September of 2005, commencing classes in the Adult Nurse Practitioner ("ANP") program.  He subsequently graduated from that program with a Master of Science degree in December 2008.  In the interim, McMahon matriculated into the School of Nursing's CRNA Program, enrolling in the program in April 2007 and commencing classes in September of that year.  A CRNA is a nurse practitioner who receives training and certification in anesthesia care.

### B.       The Various Grading Policies

The parties join issue over the grading policy or policies that were applicable to McMahon's studies in the CRNA Program.  According to McMahon, he was required to maintain a "cumulative 3.0 GPA and at least a C grade in all basic sciences and the anesthesia specialty courses."  (Opp. Br. at 4.)  McMahon reaches this conclusion by combining two documents.  First, McMahon points to a CRNA Program "Policy and Procedure Manual" with an effective date of January 2007 (2007 PPM"), which contains the above quoted language.

(McMahon Cert., Ex. B., at 1.).  Second, McMahon relies on a School of Nursing policy document entitled "Satisfactory Academic Progress" and dated April 27, 2009, which states that certain "[s]tandards for Satisfactory Academic Progress . . . are applicable for the duration of the student's continuous matriculation in the same program . . . ."  (Varas Cert., Ex. A.)  McMahon asserts that the 2009 Satisfactory Academic Policy effectively locks in the grade requirements that were in place on the date that he enrolled in the CRNA program; as such, he only needed to maintain a 3.0 GPA and get "Cs" or better to remain in good academic standing.  In short, McMahon argues that the 2009 Satisfactory Academic Progress policy retroactively bound Defendants to the minimum-grade requirements contained in the January 2007 PPM.

Defendants, on the other hand, point to two different policy documents that establish more stringent grading requirements.  The first is a CRNA Program Policy and Procedure Manual issued to students in July 2008 (the "2008 PPM").  Unlike the 2007 PPM, the 2008 PPM affirmatively states that if "a student earns a second course grade below 3.0 (B, 80%) . . . he/she earns immediate dismissal from the Nurse Anesthesia Program."  (Salmond Cert, Ex. A.)  The second document Defendants point to is the 2007 School of Nursing Handbook ("2007 Handbook"), which was issued to students and made publicly available in August 2007.  (Id. ¶ 17 & Ex. B.)  Similar to the 2008 PPM, the 2007 Handbook provides that a graduate nursing student "may be dismissed" from his academic program for various reasons, including unsafe clinical practice, two terms "with term GPA of less than 3.0," or "[t]wo course grades of less than B."  (See id. at Ex. B., D003679.)  Both the 2008 PPM and the 2007 Handbook thus allow for dismissal of a student when that student earns two grades worse than "B."  Both documents also expressly state that their contents can be amended, added to, or withdrawn at any time,

"affecting current and incoming nurse anesthesia students."  (See id. at Ex. A, D003042; id. at Ex. B., D003631 ("The University reserves the right to change any provision, offering or requirement at any time.").)

### C.    Academic Performance, Military Leave, and Dismissal

McMahon received a "C" in Advanced Physiology at the end of the Fall 2007 semester. In accordance with procedures outlined in the 2007 Handbook, McMahon appealed his grade to the Student Affairs Committee ("SAC").[2]  In conjunction with the appeal, McMahon submitted a typed and signed statement that raises a number of issues McMahon had with the manner in which his Advanced Physiology professor, Tom Pallaria ("Pallaria"), evaluated his academic performance.  (Id. at Ex. D.)  The statement also alleges that Pallaria made a number of "biased statements" about, inter alia, "old and fat people," "ethnic minorities," and "democrats."  In the document, McMahon also acknowledges that School of Nursing faculty informed him that the CRNA Program's grading policy had changed in the Fall 2007 semester; McMahon states, however, that "[c]hanging the grading policy midstream does not effectively inform students and create[s] a disadvantage on my part."  (Id. at Ex. D, D004170.)

The SAC rejected McMahon's appeal, recommending that the Advanced Physiology grade be upheld; thereafter, McMahon appealed the grade to Defendant Susan Salmond, then the interim Dean of the School of Nursing.  After meeting with McMahon, Salmond informed him

---

[2] The Student Handbook outlines the procedures that govern a grade appeal.  A student who disagrees with his grade must first try to informally resolve the issue.  If the student and faculty cannot reach a resolution, the student must then formally appeal the disputed grade to the SAC, which reviews a statement and supporting information submitted by the student and subsequently conducts a meeting with the student.  The student may not bring legal counsel to his Committee meeting, but may bring an academic advisor or colleague.  The student is given the opportunity to present "background information and supporting documentation" to the Committee, at which point a faculty member or academic dean presents other relevant supporting materials.  The Committee then deliberates on the merits of the grade appeal, votes, and conveys their decision to the student in writing.  (See Salmond Cert., Ex. B., at D003681-82.)

that she was upholding the "C" grade, but that he could retake Advanced Physiology in the Fall 2008 semester. Notably, Salmond also informed McMahon that another "course failure" could lead to his dismissal from the School of Nursing. (Id. at Ex. E.)

McMahon earned a "B" when he retook Advanced Physiology in the Fall 2008 semester. In the Spring 2009 semester, however, McMahon received a "C+" grade in his Anesthesiology & Co-Existing Disease course. Again, McMahon appealed his grade to the SAC and Dean Salmond, and again the SAC and Salmond recommended that his grade be upheld. In a letter dated May 21, 2009, Salmond informed McMahon of the decision, and that the SAC was allowing him to retake the course – and not dismissing him from the CRNA Program – because the "C+" was "earned . . . under the old [grading] policy." (Salmond Cert., Ex. H.)

The parties dispute both the particulars of McMahon's academic performance in the Summer 2009 semester and UMDNJ's treatment of McMahon's personal and military commitments during that time period. What is clear from the summary judgment record, however, is that McMahon's mother passed away in late May 2009, and McMahon thereafter engaged in discussions with his instructors to retake or reschedule exams.[3] Shortly thereafter, McMahon was ordered to report for active military duty in Niagara Falls, New York, which he later found out would prevent him from completing the Summer and Fall 2009 semesters. (Salmond Cert., Ex. P, at PS006.) It appears that UMDNJ initially balked at McMahon's request to – at his discretion – either withdraw from the four courses in which he was then enrolled or take an "Incomplete" as his grade. After corresponding with McMahon's attorney, however, UMDNJ allowed McMahon to (1) withdraw from three of his four courses and receive an

---

[3] It is also undisputed that McMahon met with Salmond on June 10, 2009 to discuss his academic performance, and contemporaneous to that meeting signed a document in which he acknowledged that "[a]ny further course grade of C+ or less will constitute immediate dismissal from the CRNA program." (Salmond Cert., Ex. I.)

"Incomplete" in the fourth,[4] and (2) re-enroll in the CRNA program in May 2010, when those four courses would be offered again. (Salmond Cert., Ex. Q, at D000080.)

McMahon did in fact re-enroll in the CRNA Program at the start of the Summer 2010 semester. At the end of the semester, McMahon received a "C" in Pediatric Anesthesia and a "C+" in Obstetrics, his third and fourth sub-"B" grades. In accordance with the procedures outlined in the School of Nursing Student Handbook, McMahon appealed the grades to the SAC, appearing before the Committee on August 16, 2010. While the resolution of the Obstetrics grade is unclear from the documentary record, the SAC decided to uphold the "C" earned in Pediatric Anesthesia. As a result of this "C," the SAC notified McMahon he was dismissed from the CRNA Program for "exceed[ing] the permissible number of failing grades[.]" (Salmond Cert., Ex. V.) The SAC further informed McMahon he could appeal its decisions to Salmond, which he did. McMahon and Salmond met on September 9, 2010, and Salmond notified McMahon that she was upholding the SAC's decision shortly thereafter.

### D. Procedural History

McMahon filed suit in New Jersey Superior Court, alleging seven contractual and quasi-contractual claims and an eighth claim for discrimination in violation of the LAD. After McMahon amended his Complaint to add due process claims under the federal and New Jersey constitutions, Defendants removed to this Court [Docket Entry 1],[5] and subsequently moved under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings on McMahon's LAD

---

[4] New Jersey law requires that, in certain circumstances, a student who is unable to complete a course because he is called to military duty may "choose" to receive "a grade of incomplete" or "withdraw from the course." See N.J. Stat. Ann. 18A:62-4.2(b), (c).

[5] This Court exercises original jurisdiction over the Constitutional due process claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over McMahon's other claims pursuant to 28 U.S.C. § 1367(a).

claims.[6]  [Docket Entry 10.]  This Court granted Defendants' motion, dismissing the LAD claims without prejudice.  [Docket 18.]  McMahon's Third Amended Complaint, filed shortly thereafter, alleged additional facts in support of his discrimination and retaliation claims.  [Docket Entry 32.]  After more than a year of discovery, Defendants now move for summary judgment on all eleven counts in the Third Amended Complaint.

## SUMMARY JUDGMENT STANDARD

Summary judgment under Federal Rule of Civil Procedure 56(a) is appropriate when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)).  "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the

---

[6] Prior to removal, McMahon amended his original Complaint to add a claim for retaliation in violation of the LAD.  [Docket Entry 1, Ex. B.]

burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. <u>Jersey Cent. Power & Light Co. v. Lacey Township</u>, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. <u>Anderson</u>, 477 U.S. at 248; <u>Siegel Transfer, Inc. v. Carrier Express, Inc.</u>, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." <u>Schoch v. First Fid. Bancorporation</u>, 912 F.2d 654, 657 (3d Cir. 1990). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." <u>Gleason v. Norwest Mortg., Inc.</u>, 243 F.3d 130, 138 (3d Cir. 2001). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Katz v. Aetna Cas. & Sur. Co.</u>, 972 F.2d 53, 55 (3d Cir. 1992) (quoting <u>Celotex</u>, 477 U.S. at 322-23).

## DISCUSSION

A.      **McMahon's Contract Claims – Counts One Through Seven**[7]

McMahon's contract-based claims rely exclusively on two premises. First, McMahon argues that under New Jersey law this Court can and should review discretionary academic decisions made by institutions of higher education under quasi-contract principles. (Opp. Br. at 20.) Second, McMahon argues that the 2009 SAP Policy had the *ex post facto* effect of binding Rutgers to more lenient grading policies that were in place when McMahon was admitted and enrolled in the CRNA Program. (Opp. Br. at 4, 23.) McMahon asserts that because the SAP Policy so bound Rutgers, Defendants "violated their own rules" by dismissing McMahon pursuant to the grading policies contained in the 2007 Handbook and 2008 PPM (see Opp. Br. at 23), and are therefore liable for breach of contract and other contract-type causes of action.

Defendants, in contrast, contend contract principles are "inapplicable" to dismissals of students for academic reasons, characterizing such actions as institutional decisions that are reviewed deferentially, if at all. (Mov. Br. at 13-15.) Defendants further contend that the 2009 SAP Policy does not bear the dispositive weight McMahon places on it and, as such, McMahon was required to comply with the more rigorous academic standards established by the 2007 Handbook and 2008 PPM. (Mov. Br. at 14-15.) Defendants argue that in light of these two factors, this Court's inquiry is limited to discerning whether Rutgers followed the procedures set out in the Handbook and the 2008 PPM when Rutgers dismissed McMahon. It is undisputed these two documents contemplate the dismissal of a student who earns two sub-"B" grades.

---

[7] Specifically, McMahon alleges causes of action for injunctive relief, breach of contract, "quasi-contract," implied contract, promissory estoppel, good faith and fair dealing, and unjust enrichment. The breach of quasi-contract and unjust enrichment claims are duplicative. See Goldsmith v. Camden Cty. Surrogate's Office, 975 A.2d 459, 463 (N.J. Super. Ct. App. Div. 2009) ("Unjust enrichment is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability." (quotation omitted)).

The Court's analysis thus proceeds in two steps. First, the Court must determine the proper analytical framework by which to review McMahon's dismissal. Second, the Court must determine which were the correct rules and regulations in effect at the time of McMahon's dismissal.

1.      The Court's Limited Role in Resolving Academic Conflicts Between Students and Universities

Initially, McMahon is correct if he can be understood to argue that New Jersey courts recognize certain instances where a student might bring a viable breach-of-contract-type claim against a public university. See Mittra v. Univ. of Med. and Dentristy of N.J., 719 A.2d 693, 696-97 (N.J. Super. Ct. App. Div. 1998) (noting contract-like relationship between student and university but rejecting "rigid application" of contract principles); Hernandez v. Don Bosco Preparatory High, 730 A.2d 365, 374 (N.J. Super. Ct. App. Div. 1999) (acknowledging the existence of protection for public university students "from the law of contracts"); Moe v. Seton Hall Univ., No-09-cv-1424 (WJM), 2010 WL 1609680, at *4 (D.N.J. Apr. 20, 2010) (same). But this argument ignores the unique and limited nature of judicial review in this context. New Jersey courts – and courts in this District applying New Jersey law – have uniformly rejected the "rigid application of contractual principles to university-student conflicts involving academic performance." See, e.g., Mittra, 719 A.2d at 694; Mehta v. Farleigh Dickinson Univ., No. 09-cv-0455 (SDW), 2012 WL 458421, at *8 (D.N.J. Feb. 9, 2012), vacated in part on other grounds, -- F. App'x --, 2013 WL 3532328 (3d Cir. July 15, 2013).

Indeed, New Jersey law counsels caution and restraint when adjudicating academics-based dismissals. Mittra, 719 A.2d at 697 (emphasizing the deleterious effect a strict contract analysis would have on "academic freedom" and noting that "controversies concerning student

academic performance . . . generate precisely the kind of disputes that the courts should be hesitant to resolve").  The Court's analytical framework in this context is thus a limited one – were the procedures Defendants followed in dismissing McMahon "in accordance with [the university's] rules and regulations."  Id. at 697; Mehta, 2012 WL 458421, at *8.  In other words, absent some evidence that Rutgers "deviated in some significant way from its published rules and regulations," Mittra, 719 A.2d at 698, McMahon's mismmash of contract-based claims cannot surmount summary judgment.

        2.        <u>The Grading Policy in Place at the Time McMahon Was Dismissed</u>

In light of the applicable scope of review, determining which grading standard was in effect at the time Rutgers dismissed McMahon is critically important.  In short, if McMahon's argument is correct, and the 2009 SAP Policy retroactively bound Rutgers to an earlier and more lenient grading policy, there is evidence from which a reasonable fact finder could conclude that Defendants departed from the School of Nursing's rules and regulations when they dismissed McMahon.  Summary judgment would therefore be inappropriate.  In contrast, if Defendants are right, and the 2009 SAP Policy is inapplicable, McMahon has proffered no competent evidence that Rutgers deviated in a meaningful way from established rules and regulations that required dismissal from the CRNA program after a second grade of "C."

The Court agrees with Defendants.  Section VII, Part K of the SAP Policy, upon which McMahon relies exclusively, reads in pertinent part:

> Standards for Satisfactory Academic Progress included in "Requirements for Graduation" distributed to a student upon matriculation are applicable for the duration of the student's continuous matriculation in the same program, despite any changes in standards that may apply to newer matriculants.

(Varas Cert., Ex. A.) McMahon's argument is essentially that when the SAP Policy says "Requirements for Graduation . . . applicable for the duration of the student's continuous matriculation," it is referring to the minimum grades a student must earn to remain in good standing in a given course of study. McMahon, however, has proffered no evidence that tends to indicate the above quoted language in any way refers to the grade requirements set forth in the 2007 PPM. Simply saying something is so, which is effectively what McMahon does here, will not suffice at summary judgment. See Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) ("a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue" (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986))). The Court is skeptical that the SAP Policy, without explicitly saying so, can have the effect of retroactively restoring outdated grade standards that have been superseded by the more recent standards contained in the 2008 PPM and 2007 Handbook.

Indeed, Defendants proffer documentary evidence that tends to indicate that the above-quoted language has nothing to do with minimum grade requirements and everything to do with course requirements – *i.e.*, the types of classes a School of Nursing student must take to earn a degree in a chosen program. Defendants point to the phrase "Requirements for Graduation," which is also the title of a section in the 2007 Handbook that addresses how each individual School of Nursing program determines the "course requirements for its graduates." (Varas Cert. ¶ 7, Ex. B. at 2). The "Requirements for Graduation" section of the Handbook only pertains to the classes a student must complete to earn a degree. It does not make any mention whatsoever of the minimum grade a student must achieve to pass each of those classes. As such, and considering the abject lack of evidence tying the 2009 SAP Policy to the 2007 Policy and

Procedure Manual, no reasonable fact finder could conclude the 2009 SAP Policy has the retroactive effect on the CRNA Program's minimum-grade requirements that McMahon says it does.

Defendants also submit evidence that the 2009 SAP Policy was written to comply with Department of Education regulations set out in 34 C.F.R. § 668.1 *et seq.* (See Varas Cert. ¶ 3.) Notably, § 668.34 of those regulations is itself titled "Satisfactory Academic Progress." § 668.34 addresses, *inter alia*, the "pace" by which and "maximum timeframe" in which a student must complete his entire course of study. See § 668.34(a)(5)(i) ("The [school's satisfactory academic progress] policy specifies the pace at which a student must progress through his or her educational program to ensure that the student will compete the program within the maximum timeframe . . . ."). This language dovetails with evidence submitted by Defendants that tends to indicate one goal of the 2009 SAP Policy was to prevent programs from extending their duration and thereby force students to incur more loan debt to obtain a degree. (See Varas Cert ¶ 7 (noting that Section VII, Part K prevents programs from altering course requirements and forcing students to "take courses for an additional semester and therefore" incur greater than anticipated "financial aid debt").). Indeed, the administrative history indicates that one effect of § 668.34 is to "lower student debt levels." See 75 Fed. Reg. 66,880 (Oct. 29, 2010).

Furthermore, it is undisputed that on June 10, 2009, two months after the SAP Policy was released, McMahon signed an agreement in which he acknowledges that another "course grade of C+ or less will constitute immediate dismissal from the CRNA program." (Salmond Cert., Ex. I.) Defendants argue that this document has the effect of binding McMahon to its terms, (Mov. Br. at 15), and McMahon argues that the agreement is void for lack of consideration.

(Opp. Br. at 27.)  But as the Court has already explained, strict contract principles do not apply in the present case.  In light of the June 10, 2009 agreement, however, it is undisputed that McMahon was on notice of the sea change in grading policy from the 2007 PPM to the 2008 PPM and 2007 Handbook – *i.e.*, the School of Nursing tightening its academic standards from "C or better" to "nothing worse than B."

Taken cumulatively, all of the foregoing leads to the inexorable conclusion that McMahon's strained and ambitious interpretation of the 2009 SAP Policy is simply incorrect, and the grading standards contained in the 2008 PPM and 2007 Handbook were in force when Defendants dismissed McMahon from the CRNA Program.[8]  As such, McMahon's contract-type claims cannot survive.  As described in detail *supra*, the Court's inquiry here is limited to determining whether Defendants followed the School of Nursing's own "rules and regulations" when they dismissed McMahon after he received a "C" and "C+" in his Pediatric Anesthesia and Obstetrics courses, respectively.  It is undisputed Defendants did so.  The evidence indicates that,

---

[8] McMahon also relies on a covertly tape-recorded June 10, 2009 conversation between himself and Salmond; McMahon provided a one-minute portion to the Court in his opposition papers.  (See McMahon Cert., Ex. D).  In that excerpt, Salmond states that an outdated grading policy "followed" students, and McMahon himself states that he was "under the old policy." (See id. (audio recording).)  McMahon argues that these statements are proof that "the academic policy distributed to [him] upon matriculation is applicable for the duration of [his] time in" the CRNA Program.  (Opp. Br. at 5, 22.)

Defendants argue this one-minute portion of the conversation is taken out of context. (Reply Br. at 5.)  It may well be.  Even so, all the excerpt tends to prove is that the SAC cut McMahon slack in June 2009 when it chose not to dismiss him from the CRNA Program after he received a second "C" grade.  (See McMahon Cert., Ex. D (referencing the grievance committee's application of a previous grading policy to McMahon).)  The recording is not evidence from which a reasonable fact finder could conclude that a quasi-contractual promise existed that bound the School of Nursing to apply a defunct grading policy to McMahon for the duration of his studies.  Indeed, on the same day as the recorded meeting, McMahon signed a document in which he expressly acknowledges that another sub-"B" grade will result in his dismissal.  (Salmond Cert., Ex. I.)  In sum, the June 10, 2009 conversation between McMahon and Salmond does not bear the weight McMahon places upon it, and does not create a genuine issue of material fact regarding which grading policy was in place when McMahon was dismissed.

pursuant to the 2007 Handbook, McMahon presented his appeal to the SAC, and when the SAC

decided to uphold the "C" in Obstetrics, McMahon appealed that decision to Dean Salmond.

Indeed, McMahon presents no evidence whatsoever to indicate that his grade appeals were

conducted in any manner besides that which is outlined in the 2007 Handbook.  Because

McMahon's dismissal was academic in nature, and it is undisputed that Rutgers complied with

its own rules and regulations prior to dismissing McMahon, Defendants did not breach whatever

quasi-contract obligations owed to him, and summary judgment is appropriate on all contract-

based claims.

>    **B.     McMahon's Due Process Claims – Counts Ten and Eleven**

McMahon also asserts due process claims under the federal and New Jersey

constitutions.[9]  Although unclear from the Third Amended Complaint, McMahon's brief in

opposition asserts claims for violation of his procedural and substantive due process rights.

Defendants argue that neither type of due process claim can survive summary judgment because,

*inter alia*, Rutgers afforded McMahon due process beyond what is constitutionally required, and

McMahon possessed no substantive due process right to complete the CRNA program.  Again,

the Court agrees with Defendants, and finds that McMahon's constitutional claims cannot

withstand summary judgment.

---

[9] The Court notes that the Tenth and Eleventh Counts are styled simply as "Due Process" claims.  (Third Am. Compl. at 18.)  These claims are properly brought under 42 U.S.C. § 1983, which "provides a [private] cause of action for any person who has been deprived of rights secured by the Constitution . . . of the United States by a person acting under color of law."  See Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).  But in light of the determination that the claims cannot withstand summary judgment, the Court's analysis proceeds as if McMahon has properly pled his constitutional causes of action as § 1983 claims.

1.     Procedural Due Process

McMahon's procedural due process argument mirrors the argument he advances in support of his contract-based claims. McMahon contends that his procedural due process rights were abridged when Rutgers conducted "an academic hearing utilizing incorrect grading standards" – *i.e.*, by not applying the more lenient standards set out in the 2007 PPM. (Opp. Br. at 33.) The Court has already concluded McMahon's argument that the SAP Policy revived these defunct academic standards is without merit.

As such, the procedural due process inquiry in this case becomes a simple one, controlled by Board of Curators of University of Missouri v. Horowitz, 435 U.S. 78 (1978), and its progeny. See Mauriello v. Univ. of Med. & Dentistry of N.J., 781 F.2d 46 (3d Cir. 1986); Hankins v. Temple Univ., 829 F.2d 437 (3d Cir. 1987). In Horowitz, the Supreme Court rejected a procedural due process claim arising from a medical student's academics-based dismissal, noting that "[t]he school fully informed [the student] of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment." 435 U.S. at 85. The Court emphasized that "[t]he ultimate decision to dismiss [the student] was careful and deliberate." Id. Consequently, the Third Circuit has applied Horowitz and found procedural due process satisfied when a university conducts "an informal faculty evaluation with the student" prior to discharging a student "for academic reasons." See Mauriello, 781 F.2d at 51-52 (finding adequate process where student "was informed of her academic deficiencies, was given an opportunity to rectify them during a probationary period before being dismissed, and was allowed to present her grievance to the graduate committee").

Applying these standards here, and considering the deference that Defendants' academic judgment is due, it is clear that McMahon received constitutionally adequate process before being dismissed from the CRNA program. Among other procedural protections, McMahon was able to appeal every disputed grade to the SAC and present supporting documentation to the Committee. Indeed, McMahon was then able to present the SAC's decision to the Dean of the School of Nursing for review. Such procedures tend to indicate Defendants' decision was "careful and deliberate;" in point of fact, the record reveals a faculty evaluation well beyond "informal." Given this proof, and the fact that McMahon places total reliance on the inapplicable 2009 SAP Policy, Defendants are entitled to judgment as a matter of law on McMahon's procedural due process claim.[10]

## 2. Substantive Due Process

McMahon's claim for denial of substantive due process must also fail. Initially, the Court is skeptical that McMahon has a constitutionally protected interest in his continuing enrollment in a graduate-level nursing program. See Manning v. Temple Univ., 157 F. App'x 509, 514 (3d Cir. 2005) ("This Court has strongly suggested that the right to continued graduate education is not protected by substantive due process." (citing Mauriello, 781 F.2d at 50)). In any event, McMahon has provided no legal authority or competent evidence substantiating such an interest apart from his conclusory statements that he "has a constitutionally protected interest in continuing his education" and that "substantive due process" prevents Defendants from terminating that education "for arbitrary reasons." (Opp. Br. at 32.) These contentions are

---

[10] To the extent that McMahon's opposition brief can be read to suggest that he should have been allowed the benefits of a full-blown adversary proceeding, including the ability to have counsel and cross-examine witnesses (See Opp. Br. at 19), the Court rejects such an argument, since it is unsupported by legal authority and indeed contrary to Third Circuit and New Jersey precedent.

wholly insufficient at the summary judgment stage.  See Mucci v. Rutgers, No. 08-cv-4806

(RBK), 2011 WL 831967, at *19 (D.N.J. Mar. 3, 2011) (granting law school summary judgment

on claim alleging constitutionally protected interest in "readmission to law school" and noting

that "courts should not readily expand the scope of substantive due process protections").

But even assuming, *arguendo*, the existence of some substantive due process right to

complete the CRNA program, McMahon has not satisfied his burden of showing that

Defendants' decision to dismiss him from the program was arbitrary and capricious.  See

Manning, 157 F. App'x at 514-15 (citing Regents of the Univ. of Michigan v. Ewing, 474 U.S.

214, 227-28 (1985)).  Stated differently, it was McMahon's burden to show that Defendant's

decision to dismiss him because of his grades was "beyond the pale of reasoned academic

decision-making." Id. at 515 (quoting Ewing, 474 U.S. at 227-28).   But the record is devoid of

evidence that tends to indicate that McMahon was dismissed for any reason besides his multiple

"C" grades.  See Mucci, 2011 WL 831967, at *19 ("A minimum grade-point average is a

legitimate and rational means for evaluating student performance and eligibility to continue in a

program of study.")  As such, "the evidence does not permit a finding that [McMahon's]

dismissal was for reasons other than the quality of [his] academic performance," Mauriello, 781

F.2d at 52, and McMahon's substantive due process claim must fail.

C.      **McMahon's LAD Claims – Counts Eight and Nine**

McMahon brings claims for discrimination and retaliation in violation of the New Jersey

LAD.  Section 10:5-12(l) of the LAD makes it unlawful for "any person to refuse to . . . provide

goods and services or information to . . . any other person on the basis of . . . liability for service

in the Armed Forces of the United States . . . ."  This Court has previously held that "the

18

discriminatory dismissal of a student from the CRNA [P]rogram [on the basis of military status] would constitute a violation of the goods and services subsection of the LAD." (October 26, 2011 Opinion, at 10 [Docket Entry 17].) That holding, however, was limited insofar as the Court concluded "a claim of mere harassment by the Defendants during [McMahon's] studies at UMDNJ would not violate the goods and services subsection of the LAD." (Id. at 11.)

        1.    Discrimination on the Basis of Military Status

In light of this prior guidance from the Court, Defendants suggest, and McMahon does not dispute, that the Court should analyze McMahon's military-status discrimination claim under the two-part burden shifting framework developed in Sheehan v. Department of the Navy, 240 F.3d 1009 (Fed. Cir. 2001), and applied by the Third Circuit in Hart v. Township of Hillside, 228 F. App'x 159 (3d Cir. 2007). (See Mov. Br. at 25-26.) Under the Sheehan/Hart framework, the plaintiff has "the initial burden of production to show that, by a preponderance of the evidence," his "military service was 'a substantial or motivating factor'" in the adverse decision. See Hart, 228 F. App'x at 162-63 (quoting Sheehan, 240 F.3d at 1013)). Should the plaintiff meet this burden, defendant "has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that" defendant would have "taken the adverse action anyway, for a valid reason." See id. at 162-63; Sheehan, 240 F.3d at 1014 (noting the burden shifts to the defendant to "prove the affirmative defense that legitimate reasons, standing alone, would have induced . . . the same adverse action"). The Third Circuit has stated that, unlike the oft-applied McDonnell Douglas burden shifting framework, under a Sheehan analysis "the burdens of production *and persuasion* shift to the defendant[]" after the plaintiff shows military status was "a substantial and motivating factor." Id. at 163 (emphasis added).

Taking its cue from Defendants, the Court will assume *arguendo* that in this case McMahon has met his burden and shown that his military status was a "substantial and motivating factor" in his dismissal from the CRNA Program. Even so, the Court finds that Defendants have met their burdens of production and persuasion and demonstrated that McMahon was dismissed because he received at least one "C" in the summer of 2010; in light of McMahon's previous grades and the School of Nursing's academic policy, this is an acceptable "legitimate and non-discriminatory" reason for McMahon's dismissal. In short, and as discussed at length *supra*, the applicable grading policies in place in July 2010 mandated dismissal from the program for a student who received two grades below "B," and McMahon does not dispute he received a "C+" and a "C" in two courses that summer. Under the Sheehan/Hart framework, this is a sufficient basis for the entry of summary judgment in favor of Defendants on McMahon's LAD discrimination claim.

Ignoring this Court's October 26, 2011 Opinion, McMahon's opposition focuses exclusively on what amounts to allegations of mere harassment during his studies at UMDNJ. (See Opp. Br. at 34-37.) For instance, McMahon cites evidence that "[t]he school . . . became hostile" with him when, in June 2009, McMahon informed the Dean and faculty he needed to go on military leave and report for duty in Niagara Falls, New York. (Id. at 35.) McMahon also points to evidence that he was forced to enlist an attorney before UMDNJ would allow McMahon to decide for himself whether to withdraw or take Incompletes in the courses he was unable to finish because of military service. (See id. at 36-37.) This evidence is immaterial to the present motion. As McMahon's own opposition states, he was allowed to withdraw from the CRNA Program for the duration of his military service and re-enroll in the summer of 2010, a

semester in which he received two grades worse than "B." McMahon has simply not identified, and this Court has not itself uncovered, any competent evidence that indicates that those grades or the appeals process that led to McMahon's dismissal were actuated in any way by animus towards McMahon's membership in the Air Force. Indeed, apart from McMahon's own testimony about UMDNJ's hostility towards his military status, it is undisputed that the School of Nursing allowed him to withdraw from the CRNA Program in July 2009, complete his military service, and subsequently re-enroll in the Program in May 2010.[11] Since evidence that would tend to indicate discriminatory intent after that date is nonexistent, Defendants are entitled to judgment as a matter of law on Count Eight of the Complaint. See Fed. R. Civ. P. 56(a).

2. Retaliation

McMahon's retaliation claim must fail for similar reasons. New Jersey's LAD makes it illegal for "any person to take reprisals against any person" for certain enumerated reasons. See N.J. Stat. Ann. § 10:5-12(d). But McMahon points to no record evidence that demonstrates he was dismissed from the CRNA Program as a reprisal against him on the basis of his service in the armed forces.[12] Instead, McMahon argues that Defendants retaliated against him for

---

[11] McMahon references a fitness evaluation Defendants required him to undergo before returning to his clinical coursework. (Opp. Br. at 35.) It is undisputed that in May 2010 McMahon underwent the requested fitness evaluation and was deemed psychiatrically fit to continue his studies. (Defs.' L. Civ. R. 56.1 Statement 74-75; Plf.'s L. Civ. R. 56.1 Statement ¶¶ 87- 92.) McMahon, however, misses the mark if the requirement that he take a fitness evaluation is being proffered as proof of military discrimination. The fitness evaluation was only ordered after two School of Nursing clinical instructors observed McMahon in his clinical practicum and indicated "concerns for patient safety." (Salmond Cert., Ex. J, at 1.) A nursing school undoubtedly has a legitimate pedagogical reason to require a graduate level student to prove psychiatric fitness prior to interacting with his clinic patients.

[12] In the Third Amended Complaint, McMahon states that the Eighth and Ninth Counts (LAD discrimination and retaliation, respectively) contain "LAD Armed Forces discrimination claims." (Third Am. Compl. ¶ 91.) It was unclear from previous versions of the Complaint whether the alleged retaliation only related to military status discrimination or was intended to cover other types of discrimination. (See, e.g., Second Am. Compl. ¶ 84 (noting, in the Count

complaints made to UMDNJ regarding "discriminatory statements" made by Professor Pallaria about "older people, obese individuals, homosexuals and minorities . . . ."  (Opp. Br. at 38.) McMahon also asserts that he told UMDNJ that he felt as if he was being "discriminated against" because of his age and weight.  (See id.)

Even taking this evidence at face value, however, it has nothing to do with any alleged military status discrimination.  For such evidence to make a difference at summary judgment, McMahon would have needed to plead an appropriate retaliation cause of action.[13]  He did not, and the Court will not read his opposition papers to do so now.  Bell v. City of Philadelphia, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." (quoting Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996))).  Given that McMahon has pointed to no relevant evidence of retaliatory animus or a connection between his dismissal from the CRNA Program and his military status, it follows that Defendants are entitled to summary judgment on McMahon's LAD retaliation claim as well.

---

immediately following the armed forces discrimination claim, that "Defendants subjected Plaintiff to reprisals because of his complaints of Defendants' unlawful harassment and discrimination practices").).

[13] Given the present record, summary judgment would be appropriate on other conceivable retaliation causes of action as well.  Assuming an LAD retaliation claim is even cognizable in the university-student context, McMahon fails to demonstrate the requisite causal connection between his December 2007 complaint and his July 2010 dismissal from the CRNA Program.  See, e.g., Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 198 (3d Cir. 1996) ("[t]o establish a prima facie case" plaintiff must show, inter alia, a causal link between the protected activity and adverse" decision (quotation and marks omitted)).  Indeed, the only attempt McMahon makes to manufacture the necessary link is the conclusory statement that he "suffered retaliation in a variety of ways that eventually led to his dismissal from the school," (Opp. Br. at 38); it is beyond cavil that such a statement is insufficient, without more, to surmount a summary judgment motion.  See Podobnik, 409 F.3d at 594.

## **CONCLUSION**

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment. An appropriate form of Order accompanies this Opinion.


                                           _____s/ Stanley R. Chesler_____
                                           STANLEY R. CHESLER
                                           United States District Judge


Dated: November 4, 2013